CULPEPPER, Judge.
This is a companion case to State of Louisiana, Through the Department of Highways v. Whitaker, et al., La.App., 143 So.2d 408, and State of Louisiana, Through the Department of Highways v. Murrell, La.App., 143 So.2d 411, in which separate decisions are being rendered by this court on the same date. These three expropriation suits, filed under the provisions of LSA-R.S. 48:441-460, were consolidated for trial, in view of the proximity of the property involved and the similarity of the evidence presented. The only issue is the amount of compensation to which each defendant is entitled. All defendants have appealed, asking increases in the awards made by the lower court. Plaintiff has answered the appeals, seeking reductions in said awards.
In a well considered written opinion, our learned brother below has carefully analyzed the evidence, stated the facts and correctly applied the law thereto, in the following portion of his opinion which we adopt as our own:
“STATE V. MURRELL
“This suit involves the taking of 128,-680 square feet of an approximately five- *398 acre tract of land and improvements owned by Joseph Walter Murrell, husband of Emelia Benoit Murrell. As originally filed on March 17, 1958, the taking included the landowner’s frame dwelling, garage, three chicken houses, a brooder feed house and all other improvements situated thereon. The plaintiff deposited into the registry of the court the sum of $18,502.00 as the value of the land and improvements taken. The estimate of just compensation attached to the petition reflects no damages sustained by the defendant. In his answer, the defendant enumerated other improvements on the land -taken and contended that he is entitled to $47,750.00 for the land, which he had intended subdividing into lots, and all of the improvements thereon, and the additional sum of $8,750.00 as severance damages for the remainder of his property.
“Thereafter by agreement of the parties the court issued an order dated June 24, 1958, amending the declaration of taking to exclude the defendant’s residence, septic tank, butane system and deep well upon the plaintiff’s agreement to relocate same on the residual property, permitting the plaintiff to withdraw from the registry of the court $9,306.54 as the fair value of such improvements, and authorizing the defendant to withdraw the balance of $9,195.46 on account of just compensation for the property taken. Therefore, the pleadings reflect that the plaintiff has deposited the sum of $9,195.46 as the value of the land and improvements taken, for which the defendant contends he is entitled to the sum of $47,750.00 plus $8,750.00 as severance damages.
“The Murrell property is located just south of the city limits of Sulphur, Louisiana, in an area that has been devoted primarily to residential use. There are a number of small residential subdivisions in the immediate vicinity of this land, and approximately 35 or 40 per cent of the area under consideration was subdivided when the suit was filed. Schools are available. At the time of the taking there appears to have been a demand for property of this type for home sites. All of the experts agreed that the highest and best use of the property was its development as a residential subdivision.
“The landowner had sold his son a lot in the southeast corner of the tract several years before the taking. In 1955 he prepared a rough sketch or plan of a subdivision of the balance of the five acres, and discussed with the police jurors in his ward the possibility of the parish opening a road through the center of the tract. However, the property had not actually been subdivided through a survey of the lots on the ground and recordation of a plat thereof in accordance with R.S. 33:-5051. Mr. Murrell testified that he abandoned his plan for a subdivision when he learned that the highway project was going through his property.
 “As reflected in the jurisprudence reviewed above, while the owner’s future plans for the use of his property are generally irrevelant in determining market value, the true test is what prudent men, having adequate means, would devote the property to under the circumstances existing at the time of the taking. And where a tract is suited for development as a subdivision by reason of its location and the situation in the area generally, and the probabilities of its commercial development as a subdivision are not too remote or speculative, in arriving at its market value, the court, like a prospective purchaser and a seller, will take into consideration what the property would bring through the sale of individual lots in a proposed or an existing subdivision. Under the circumstances existing in this case at the time of the taking this court concludes that such rule is applicable here. As a matter of fact, all but one of the experts on both sides of the case reached their conclusions as to the market value of the subject property on the basis of a subdivision analysis, employing a front foot as distinguished from an acreage price of the land.
*399 “In considering’ comparable lot sales the defendants’ experts relied primarily on certain contracts for credit sales of lots in the nearby Guidry subdivision, and concluded that the front foot value of the subject property on the date of the taking was $20.00. On the other hand, the plaintiff’s experts relied primarily on sales of lots in the Ridgewood subdivision, approximately 330 feet south of the subject tract, and concluded that the front foot value of the property was: Coleman, $17.00; Paul-ey, $15.50; and Hines, $15.00. These witnesses felt that the Guidry Subdivision sales were not typical of the market in the area, mainly because of subsequent retrocessions in most of the transactions. This, and also the fact that the contracts provided for extremely liberal credit sales in which the seller would not receive full payment until in some instances from four to six years, have caused the court to conclude that the Guidry Subdivision transactions should not be considered as establishing the market value of the subject land, which is being expropriated for cash.
“Within a reasonable time prior to the taking, lots in the Ridgewood Subdivision were sold for $15.00 to $17.24 a front foot. However, a good many of these sales were also credit sales. The Murrell property appears to be slightly more valuable than the Ridgewood tract due to the presence of oak trees, and some fruit trees and shrubbery planted by the landowner. However, the Ridgewood Subdivision is also wooded land, with pine trees growing thereon. All things considered, the court believes that the fair market value of the subject property for subdivision purposes was $17.50 per front foot for a lot having a depth of approximately 150 feet, less the deductions hereinafter mentioned.
“According to the plat of the proposed subdivision (M-5), which seems to be as adaptable as any other plan that might be used, there are lots on Broussard Street having 330 front feet by a depth of 150 feet; on Jet Street the lots are 145 front feet by 145 feet; on the north side of the proposed Center Street are lots having front footage of 348j4 feet by 145 feet; and on the south side of this street are lots fronting 343i/¿ feet by 145 feet. This is a total of 1,167 front feet. Multiplying the total frontage of the proposed lots by $17.50 results in the sum of $20,422.00 as the value of the whole property if subdivided and sold as lots on the date of the taking at $17.50 a front foot. However, it is obvious that all of the lots could not be sold immediately in separate transactions on the date of the taking, and as heretofore pointed out the test of market value is what a purchaser of the whole tract in one sale would pay a willing seller. Any prospective purchaser of a tract for subdivision purposes is bound to take into consideration certain expenses and deductions in arriving at the purchase price of the land. All of the experts agreed that there would be some expenses to be considered in this connection, although there was a considerable variance on this subject between the witnesses for each side.
“While the evidence reveals that the parish would open the street and the lots could be sold without abstracts, it seems clear that a prospective purchaser of this land for subdivision purposes would contemplate the necessity of incurring the expenses of a survey, attorney’s fees, revenue stamps and a real estate agent’s commission for selling the individual lots: Reasonable amounts for these expenses are:
“Surveys of 16 lots @ $8.00 $ 128.00
Legal, revenue stamps and mise. 225.00 10% real estate agent’s commission 2.042,00
Total expenses $2,395.00
Deducting these expenses from the gross value of the proposed lot sales leaves the sum of $18,027.00
“Undoubtedly, a purchaser of the whole property for purposes of subdivision and sale of the lots would expect to make some profit in the transaction. The defendants’ *400 expert, Mr. Reinauer, recognized this when he said that a prudent purchaser would want to pay less if he was buying all of the Murrell property, and that it would not bring $20.00 a front foot if sold in this manner. (Tr. 131 & 133) Mr. Ableman also acknowledged that if the property was purchased as a whole for a resale there would be a question as to whether the purchaser would pay the $20.00 per front foot value that he placed on the tract. (Tr. 106) And Mr. Palermo said that he would not be expected to pay $20.00 a foot if he was buying the property ‘to make a subdivision.’ (Tr. 106) Consequently, the court concludes that a prospective purchaser of the whole tract for subdivision purposes would deduct from the price he would pay for the tract a sum to cover a reasonable profit on his investment.
“Mr. Palermo testified that his profit from subdivisions varied anywhere from 25% to 70%. (Tr. 193) Mr. Pauley used 35% for this in his analysis, and Mr. Coleman used 50%. All things considered, this court feels that a 35% profit on the proposed purchaser’s investment is reasonable. This would amount to $4,674.00, and deducted from the above figure of $18,027.00 leaves the sum of $13,353.00 as the market value of the entire Murrell property, exclusive of improvements, at the time of the taking, or the price a willing purchaser would pay a willing seller for such property for residential subdivision purposes. Two of the plaintiff’s experts deducted additional sums to cover interest on the prospective purchaser’s investment during the two year period they estimated it would take to sell the lots. The defendants’ experts on the other hand thought the lots could be sold over a period of two or three months. In view of the uncertainty in this respect and the percentage used by the court to cover anticipated profit, no additional deduction should be made for this item in arriving at the market value.
“After the taking Mr. Murrell was left with two lots on the north side of the highway right-of-way; one fronting 96.87 feet on Broussard Street with a depth of approximately 322 feet, and the other having 96 feet front on Jet Street by the same depth. Using the depth factor of 122% employed by Mr. Coleman, times the basic lot front foot value of $17.50, indicates that the remaining lots of Mr. Murrell, because of their excess depth, would have a value of $21.35 per front foot. Multiplying this figure by 192.87 feet, the total front footage of the two lots, gives the sum of $4,118.00 as the value of Mr. Murrell’s remaining property. However, there is undoubtedly some reduction in value due to its location adjacent to the highway, and the court believes that the 25% figure used in this connection by Mr. Hines is reasonable. Therefore, deducting 25% of $4,118, or $1,029, leaves $3,088 as the value of Mr. Murrell’s land remaining after the taking. Subtracting this from the value of his land before the taking, $13,353, gives a total award to Mr. Murrell for the land taken and severance damages of $10,265. $9,008.00 of this amount is just compensation for the land expropriated and $1,257 is for damages.
“In addition to this figure Mr. Murrell is also entitled to an award for the value of the improvements on his property. His witness, Mr. Palermo, estimated the value of these at $2,451.83. Mr. Pauley’s evaluation of the improvements was $2,063.00 and Mr. Coleman arrived at a figure of $1,960.00. Employing a mean average, which appears to be reasonable to the court under the circumstances, an additional award will be made to Mr. Murrell for improvements in the sum of $2,158.00. Therefore, he is entitled to the sum of $12,423.00 as just compensation for the property appropriated in this suit and damages resulting therefrom. From this amount must be deducted the sum of $9,195.46 heretofore deposited by the plaintiff and withdrawn by the defendant on account of just compensation.
“For these reasons there will be judgment rendered in favor of the defendant, Joseph Walter Murrell, husband of Emelia Benoit Murrell, and against the plaintiff, State of Louisiana, through the Department of High *401 ways, in the sum of $3,227.54, together with legal interest and costs.
“STATE V. RILEY
“This suit was filed against Walter E. Riley, the landowner, on March 10, 1958, and involves the taking of Lots 1, 12, 13, 14 and 15 and a portion of Lots 2, 4. and 5 of the Riley Subdivision, together with improvements, consisting primarily of three wood frame buildings, a shallow water well, and one-third interest in a deep well. With the taking, the defendant deposited into the registry of the court as just compensation the sum of $6,300.00, of which $6,180.00 was allocated to cover the land and improvements and $120.00 was for severance damages. This sum was withdrawn by the defendant through order of court dated June 17, 1958. However, in his answer the defendant contends that he is entitled to $15,180.00 for the taking, or $12,180.00 as the value of the property taken and $3,000.00 as severance damages. Therefore, there is in dispute in this suit a difference of $6,000.00 as the value of the land and improvements taken and a difference of $2,880.00 as severance damages.
“The Riley property is situated in the same neighborhood as the Murrell property, but it forms a part of the Riley Subdivision, which was surveyed into lots and the subdivision plat recorded prior to the taking.
“Although it has many of the same characteristics as the Murrell property, there are no trees located thereon. For this reason the court believes that a fair front foot value of this property would be $17.00 for a basic lot having a depth of from 140 to 160 feet.
“The whole tract owned by Mr. Riley before the taking consisted of Lots 1, 2, 3, 4, 5, 12, 13, 14 and 15 of the Riley Subdivision. However, Lot 3 was not taken. The size of each of Lots 2, 3, 14 and 15 is 70 feet front by 122.4 feet. Using a depth factor of 90 per cent of $17.00 because of the shallow depth, these lots had a gross sales value of $4,284.00 at the time of the taking. Each of Lots 4, 5, 12 and 13 of this subdivision had a front of 61.2 feet by 140 feet. Multiplying the total frontage of these lots, 244.8 feet, by the basic lot front foot value of $17.00, gives a total gross sales value of $4,162.00 for these lots. Lot 1 of the Riley Subdivision, having a frontage of 97.4 feet by a depth of 244.69 feet, calls for the use of an excess depth factor of 114.5%. This multiplied by the basic $17.00 front foot value times 97.4 front feet gives a sales price of $1,896.00. Therefore, the gross sales value of each of the lots in the landowner’s entire tract at the time of the taking was $10,342.00. However, as in the case of the Murrell property, a prospective purchaser of the entire tract in one sale would undoubtedly purchase same for resale as individual residential lots and would necessarily contemplate certain expenses and expect to realize a profit on the transaction. Since the property had already been surveyed and subdivided his anticipated expenses would be at a minimum and should include only the following items:
“A 10% real estate agent’s commission $1,034.00
Legal services, revenue stamps, mise. 75.00
Total expenses $1,109.00
“He would certainly expect to realize a profit on the transaction, but in view of the number of lots involved a 25% profit on his investment appears to the court to be reasonable under the circumstances. After subtracting the expenses listed above from the gross sales value of the lots there is left $9,233.00, from which must be deducted a 25% profit of $1,847.00, leaving a net value of the entire property owned by the landowner at the time of the taking of $7,386.00.
“After the taking M,r. Riley was left with a tract of land having a 78.5 feet front on Riley Street by 244.8 feet along Sunset Street. Again using the excess depth factor of 114.5% times the basic front foot value of $17.00, multiplied by the frontage *402 of 78.5 feet reflects a value for the remaining property of $1,528.00. However, from this must be deducted 25%, or $382.00, because of diminution in value of the property due to its location adjacent to the right-of-way. This gives a total value of the landowner’s property remaining after the taking of $1,146.00. Deducting this amount from the value of his entire tract at the time of the taking, $7,386.00, leaves a total award of $6,240.00 for land taken and severance damages. $391.00 thereof is for damages and $5,849.00 is for land expropriated.
“The improvements on the Riley property were valued by the plaintiff’s expert, Mr. Hines at $2,963.00 and by the defendant’s expert, Mr. Palermo, at $3,800.00. The chief difference in their appraisal seems to he in the rates of depreciation employed by the two appraisers. Using the mean value of the items on which they differed, and Mr. Hines’s valuation of the items on which Mr. Palermo expressed no opinion, gives a total valuation of the improvements on this property of $3,567.00. This added to the sum of $6,240.00 for the land taken and damages makes a total award of $9,807.00 to which the defendant in this case is entitled as just compensation. F.rom this amount must be deducted $6,300.00 as the amount deposited by the State and withdrawn by the defendant on account of just compensation.
“For these reasons there will he judgment rendered in favor of the defendant, Walter E. Riley, and against the plaintiff, State of Louisiana, through the Department of Highways, in the sum of $3,507.00, together with legal interest and costs.
“STATE V. WHITAKER, ET UX.
“This suit was filed on March 10, 1958, against the landowners, Lowell E. Whitaker, and his wife, Marjorie Riley Whitaker. It involves the taking in their entirety of Lots 9, 10 and 11 of the Riley Subdivision, together with a brick foundation and a one-third interest in a deep water well and pump. When the petition was filed the plaintiff deposited into the registry of the court the sum of $2,500.00 as just compensation for the land and improvements taken. This amount was withdrawn by the defendants by order of court dated June 17, 1958. In their answer the defendants contend that the land and improvements taken have a value of $5,750.00. There is, therefore, in dispute in this case a difference of $2,250.00 as to the value of the property and improvements.
“The Whitaker property consists of Lots 9, 10 and 11 of the Riley Subdivision, which have been taken in their entirety by the plaintiff. As in the case of the Murrell and Riley tracts, the highest and best use of this property is for residential homesites and the same comparables that were considered and applied in regard to the tracts involved in the other two suits are applicable here also.' However, like the Riley property, because there are no trees on this land, the court has concluded that a basic lot front foot value of $17.00 is applicable.
“Lots 9 and 10 are both 120 feet in depth and have a combined frontage of 188.76 feet on Andrus Street. Using a depth factor of 89% due to the shallow depths of the lots, multiplied by $17.00, results in a total gross sales value of $2,-856.00 for these two lots. Lot 11 fronts 68.59 feet on Whitaker Street by a depth of 188.76 feet. Using a depth factor of 111% to take care of the increased depth, times $17.00, gives a gross sales value for this lot of $1,293.00. Therefore, the gross sales value of the lots taken in this suit is $4,149.00.
“It is conceivable that a willing purchaser might purchase all three of these lots for his own residential use rather than for resale. But if so, it is likely that he would expect to receive at least a ten per cent discount by reason of the aggregate purchase. Deducting this $415.00 from the gross sales value of the lots leaves a net market value for the land taken of $3,734.-00.
*403 “Again, the only appraisers of the improvements on the property were Mr. Palermo and Mr. Hines. Using the mean of their two appraisals results in a value of $671.00 for the improvements. This, added to the net value of the land gives a total market value of the land taken and improvements of $4,405.00. The defendant is entitled to an award for this amount, less the sum of $2,500.00 as the amount deposited by the State and withdrawn by the defendants on account of just compensation.
“For these reasons there will be judgment rendered for the defendants, Lowell E. Whitaker and Marjorie Riley Whitaker, and against the plaintiff, State of Louisiana, through the Department of Highways, in the sum of $1,905.00, together with legal interest and costs.”
On appeal, defendants’ principal contention is that “The lower court was in error in deducting from the front foot value fixed by the court on the lots taken, various theoretical costs and profits so as to materially reduce the award to appellants.” Defendants argue that the highest and best use of the properties was for the owners to sell one lot at a time to individual purchasers for personal use as residential homesites and that therefore defendants are entitled to be compensated for the aggregate of the prices which would have been realized through such sales. Defendants contend that all of the lots could have been sold separately within the reasonable time of two or three months. They argue that by selling their lots in this manner, rather than by selling the whole of their property to one purchaser, buying for speculation and resale, they could have obtained a larger sum, because a speculator would make deductions for selling costs and profit, whereas the individual purchaser would not.
In our opinion, this basic issue is answered in the recent case of Parish of Iberia v. Cook, 238 La. 697, 116 So.2d 491 (1959), in which the court held as follows:
“In determining the market value of property expropriated, it must be conceded that it is not merely the value for the use for which it has been applied by the owner that should be taken into consideration. The possibility for its use for all available purposes for which it is adapted and to which it might in reason be applied should be considered. The ultimate test of value in that respect is what men of wisdom and prudence and having adequate means would devote to the property if owned by them. On the other hand, possible uses which are so remote and speculative and which would require the concurrence of so many extrinsic conditions and happenings as to have no perceptible effect upon present market value should be excluded from consideration. In speaking of adapted uses of the property, it is meant the use of the property in its present condition as a whole. The owner’s plans or hopes for the future should be held completely irrelevant, being more often illusory than real. Situations may arise where land is actually available for commercial development, as subdivided lots. The measure of compensation in such instances should not he the aggregate of the prices of the lots into which the tract could he divided, for so many contingencies may intervene as to make such measure of compensation too uncertain and conjectural. The test is the market value of the land as a whole, taking into consideration its value for building purposes of a not too speculative nature. See La. Ry. & Nav. Co. v. Baton Rouge Brickyard [136 La. 833, 67 So. 922, L.R.A.1917A 402], supra; Louisiana Highway Commission v. Lasseigne, 177 La. 440, 148 So. 672; City of New Orleans v. Moeglich [169 La. 1111, 126 So. 675], supra; *404 Housing Authority of Shreveport v. Harkey, 200 La. 526, 8 So.2d 528.”
In Nichols, The Law of Eminent Domain (3rd Ed. 1952) Vol. 5 Sec. 18.11(2) pp. 114-116 we find the following general discussion of the reasoning behind the court’s reluctance to allow the owner of vacant land to prove the market value thereof by introducing evidence of the return that he would derive from the individual sales of subdivision lots:
“As bearing upon these issues the owner may offer a plan showing a possible scheme of development for the purpose for which it is most available, provided it appears that the likelihood of demand for the property for that purpose is such as to effect market value. He cannot, however, go further and describe in detail to the jury a speculative enterprise for which in his opinion or that of some expert the land might be used, and base his estimate of value upon the profits which he would expect to derive from the enterprise. The owner cannot, for example, introduce evidence of the return that he would derive from cutting up a vacant tract of land into building lots, since this would involve pure conjecture as to how fast the lots would be sold and the price that each would bring; and the details of a possible improvement of the land, and its value, or the expected profits or rentals after such improvement was completed are equally inadmissible, for the same reason. The trial court cannot be too careful in excluding evidence of this character, as witnesses can always be found who will, in their imagination, cover the most hopelessly unmarketable vacant land in the neighborhood of a large city with apartment houses filled with desirable tenants, and with the aid of a little figuring, capitalize the prospective net income at ten times the actual value of the land, or convert a noisome brook which has never been of the slightest service to the riparian owners into a prospective site for a mill or a bleachery, the value of which can be determined only by capitalizing the annual cost of water from the city pipes of a quantity equal to the annual flow of the brook. Such evidence does not tend to show market value, since it utterly disregards the fact that hundreds of acres of land upon which the same development could be equally well undertaken can be bought at prices determined by cold and unimaginative bargaining between seller and buyer and the immutable laws of supply and demand; but it sometimes misleads the jury and the safe course for the court, it would seem, is to exclude it. If, however, as previously stated, the adaptability for such potential use is such as to have a positive influence upon present market value it has been held competent for a witness to express an opinion as to the adaptability of the property for such purpose. A map or plan which graphically illustrates the potential use is equally admissible in such circumstances.”
In 29 C.J.S. Eminent Domain § 160 pp. 1027-1028 the law is stated thus:
“Adaptability for building lots. It may be shown that the ground is adapted to be cut up into town or city lots, or that it may be subdivided into smaller building lots. Such use cannot be considered where it is merely speculative and is too remote to influence the present market value of the land; but such use is not as a matter of law too speculative simply because the land is not at the time built on, the owner has not filed a town plat, or the land is used by the owner only for farming or dairy purposes. The value to be considered is the value of the tract for subdivision purposes, not the value of each of the proposed lots.”
In 18 Am.Jur. 880-881, Sec. 244 we find the following statement:
“The uses which may be considered' must be so reasonably probable as to *405 have an effect on the present market value of the land; a purely imaginative or speculative value cannot be considered. There must be a possibility •considerable enough to be a practical consideration and actually to influence prices. For example, when a tract taken by eminent domain is used as a farm, the owner is entitled to have its possible value for building purposes considered; but the jury or other tribunal is not to determine how it could best be divided into building lots, nor conj ecture how fast they could be sold, nor at what price per lot. As a rule, projects of the owner in regard to the land are too remote and speculative.”
In our opinion, the trial judge was correct in concluding from the evidence in this case that it falls within the law as quoted above from Parish of Iberia v. Cook, supra. The proposed plans of the defendants to develop and sell their lots by individual sales is too uncertain and conjectural for the court to use the aggregate of the prices of the lots as the measure of compensation. This is particularly true as to the time it would take to sell all of the lots. The evidence is most unsatisfactory in this regard. Although defendants’ experts, Mr. Abel-man and Mr. Palermo, testified they thought all of the lots could be sold within three months after they were put on the market, it is apparent from the testimony of defendants’ expert, Mr. Reineaur, that he was not nearly so certain in this regard. Plaintiff’s witnesses testified that they thought it would take about two years to sell all of the lots. Plaintiff’s experts are certainly corroborated by the fact that these lots are located outside the city limits of Sulphur in an area which is only partially developed and where there are similar subdivisions with many unsold and vacant lots.
Having reached the conclusion that the above quoted law from Parish of Iberia v. Cook, supra, is applicable to the facts of the instant case, we find that all of the appraisers for the defendants have followed an incorrect procedure by basing their appraisals on the assumption that the lots would be sold one at a time, by the owners, to individual purchasers for homesites, rather than assuming that the property as a whole would be sold to one purchaser. Defendant’s appraisers freely admitted that if the property as a whole was sold to one prudent purchaser, the price per front foot would not be near as high because such a purchaser would have to make deductions for development costs, realtor’s commissions and profits. For instance, we find defendants’ appraiser, Mr. Abelman, testifying as follows:
"Q. Would you recommend that a prudent purchaser purchase this land on the basis of $20.00 a front foot for resale to individuals as homesites?
“A. As I mentioned * * * I’m going to have to go around in circles to answer your question because you are getting into a hypothet, which I did not base value on. I appraised the property based on its highest, best use, according to the strictest interpretation of highest, best use. If I had a client who wanted an individual homesite, very definitely I would recommend it to them, because I think it was better than anything available in the area at that price. For a resale, that is something entirely different. I didn’t say this was speculative investment property. That is not its highest, best use, no.”
We find defendants’ appraiser, Mr. Rein-eaur, testifying as follows:
“Q. I am speaking of a prudent purchaser who would purchase the entire property, assuming that Mr. Mar-rell wanted to sell his entire lot. Would a prudent purchaser purchase that land for subdivision purposes or would he purchase it as being an existing subdivision?
“A. I would say a prudent purchaser, if he were going to purchase the entire subdivision, would want it at a less figure than we put on it.
*406 “Q. Than by lots.
“A. Yes, sir, but I don’t think that would be the best advantage to sell the property.
“Q. Then did you value * * * was your value based on actually, the value which Mr. Marrell could get for his property if he sold his property by the lot?
“A. Yes, sir.
“Q. Rather than the entire tract of land.
“A. Yes, sir. There, again, it may be very much to somebody’s advantage to sell five lots this year and five lots next year, and five lots the year after. These days with income taxes like they are, and if they don’t have much other income, he can very definitely save a great deal of money on income tax alone simply by taking the profit over a period of years rather than in one year.”
Defendants’ appraiser, Mr. Palermo, testified :
“Q. In determining the value before the taking, let’s assume for the purpose of this discussion that we sell the entire Marrell property. Did you attempt to put a value on the entire Marrell property sold to a single owner?
“A. No, sir. First place, you couldn’t buy it that way.
* * * * >fc #
“Q. What would you do with that land if * * *
“A. If I was going to use it for a homesite, yes, I would pay $20.00 a foot.
“Q. If you were buying the entire tract.
“A. I didn’t say the entire tract. If I was going to buy the lot. I’m not buying the entire tract. You know yourself if you were buying the entire tract, you wouldn’t pay $20.00 a foot for it for the simple reason you’ve got to make some money out of it.”
The above excerpts from the testimony of defendants’ appraisers show that they based their estimates on the aggregate of the prices of the lots, if sold in individual sales, rather than the market value of the whole, if sold to one willing purchaser. This method is clearly erroneous under the holding in Parish of Iberia v. Cook, supra. Under cross-examination, all of the defendants’ appraisers admitted, as plaintiff’s appraisers testified, that if the property was sold as a whole to one purchaser, these deductions for development costs, realtor’s commissions and profits would have to be taken into account. We therefore conclude that the trial judge was correct in allowing these deductions.
Able counsel for defendants contends that this holding is contrary to the recent case of State Through Dept. of Highways v. Boyer, 130 So.2d 738 (3rd Cir. La.App. 1961), involving similar property, best suited for residential subdivision purposes, and actually situated in the same area as the properties involved in the instant cases. There the court concluded that individual lots could have been sold for homesites at $25 per front foot, but deducted expenses necessary to provide utilities and to construct and surface the streets, leaving a front foot value of $18.49 at the time of the taking. The opinion does not mention that any amount was deducted for realtor’s commissions or profits. This apparently was not an issue in the case. The principal issue was whether the property should have been appraised as acreage or by the front foot and the court approved the front foot method. We do not find State v. Boyer, supra, contrary to our holding herein. Nowhere in the Boyer case is it stated that the measure of compensation is the aggregate of the prices derived from the individual sales of lots to a number of purchasers. Apparently, the issue was not pre *407 sented, but there is nothing in the opinion to show that the property could not have been sold as a whole to one purchaser for $18.49 per front foot. The Boyer case is not authority for the proposition contended by defendants, that the measure of compensation is the aggregate of the prices for which the lots could have been sold by their owner to various purchasers over a period of time.
Counsel for defendants also cites State Through Dept. of Highways v. Barrilleaux, 139 So.2d 242 (1st Cir. La.App.1962) in which the Department of Highways expropriated six lots of an existing subdivision in the center of the town of Lockport. The evidence showed that the property owners had been placing their lots on the market, three blocks at a time, and had already made sufficient sales of comparable lots to establish the market value of those expropriated at $1800 per lot. No additional expense was required for streets, utilities, surveying or any other costs of developing or selling the property. The court refused to deduct any amount for selling expense, realtor’s commissions or anticipated profit to a speculator purchasing for resale and found that based on comparable sales of lots in the same subdivision, separated only “[by] three strands of barbed wire” from the lots expropriated, the value thereof was $1800 per lot.
We do not find that the holding in the Barrilleaux case is necessarily inconsistent with our holding in the instant proceedings. The court did not discuss whether it based its holding on the sale of the six lots to one purchaser or on the sale of the six lots to individual purchasers. It is entirely possible that, under the facts in the Barrilleaux case, the six lots expropriated could have been sold to one purchaser for $1800 per lot, or could have been sold within a reasonable time to different purchasers, in which event the .court’s decision would be entirely consistent with our own in the instant proceedings. There is nothing in the Barril-leaux decision to indicate to the contrary. Therefore, we do not find that the holding in the Barrilleaux case is necessarily inconsistent with Parish of Iberia v. Cook, supra, or with our own holding in the instant cases.
By answers to the appeals in all three cases under consideration here, plaintiff contends that the awards are excessive. As to the Murrell property, plaintiff contends that since no plat of the subdivision had been recorded previous to the taking, in compliance with LSA-R.S. 33:5051, it was improper for the trial judge to allow the introduction of evidence as to the value of the proposed lots on a front foot basis, it being the position of the plaintiff that the property should have been appraised only as raw acreage suitable for subdivision purposes. In our opinion, the trial court has correctly followed our recent decision in State v. Boyer, supra, where we specifically held that noncompliance with LSA-R.S. 33:5051 as to the recordation of a subdivision plat did not prohibit appraising property for condemnation purposes as a subdivision. In the Murrell case, like the Boyer case, the evidence shows that at the time of the taking, the property had been developed to the extent that a willing seller and a willing buyer would have arrived at an agreement as to the price, based on an amount per front foot, rather than on an acreage basis, even though a plat subdividing the property into lots and blocks had not been recorded. The trial judge has correctly applied the law as set forth by this court in State v. Boyer, supra.
Plaintiff also contends the evidence of sales of comparable residential lots in the area does not show a front foot value of $17.50, as was found for the Murrell property, or $17.00, as was found for the Riley and Whitaker properties. Our answer to this contention is that we agree fully with the lower court’s analysis of the evidence as set forth hereinabove. We likewise agree with the lower court’s determination of the value of the improvements taken *408 and the amount of severance damages. As we stated in State v. Boyer, supra:
“The trial court’s factual determination as to the value of property expropriated, reached after hearing the witnesses will not be disturbed in the absence of manifest error.”
Defendants’ final contention is that the lower court was in error in not taxing as costs of court the full amount of the fees charged by defendants’ expert witnesses. The evidence shows that Mr. Mose Abelman and Jules Reinauer charged $980 for preparation plus $700 for court appearances, making a total of $1680. Mr. Joseph R. Palermo charged $540.50 for preparation plus $350 for court appearances, making a total of $890.50. Mr. Ray Burgess, a civil engineer, charged a total of $350. Allowing only a portion of these charges to be fixed as court costs, the trial judge held as follows:
“Both Mr. Abelman and Mr. Palermo were on the stand for a number of hours and were questioned at length by counsel for both sides. However, Mr. Reinauer’s testimony was given in a relatively short time as he adopted as his own much of Mr. Abelman’s testimony. Under the circumstances the fees of Messrs. Abelman and Palermo for testifying will be fixed in the sum of $100 each, and Mr. Reinauer’s fee for his court appearance will be fixed in the sum of $65.00. The law also provides for an additional allowance for preparation by expert witnesses. In view of the amounts involved in the suits, and all other things being considered, the court believes that additional allowances of $250.00 each for Messrs. Abelman, Reinauer and Palermo will constitute reasonable compensation for their preparation to testify in this case. In the formal judgments the fees of these experts will be prorated in proportion to the amounts awarded as just compensation for the land and severance damages in each separate case and taxed as costs.”
We are most reluctant to find an abuse of discretion by the trial judge with reference to the fixing of the amount of expert fees as court costs. Finding no-manifest abuse of discretion, we will not interfere with this portion of the judgment appealed.
For the reasons assigned the judgment appealed is affirmed. All costs of this appeal are assessed against the defendant-appellant.
Affirmed.