FOURNET, Chief Justice
(dissenting).
According to the record in this case, the State of Louisiana, in conjunction with the federal government, is presently engaged in the construction of a number of controlled access and divided superhighways running through the state, one being U. S. 90, commonly known as the Old Spanish Trail, that extends from Florida into west Texas. Under this program the portion of U. S. 90 between a point at the east end of the Wax Outlet Bridge and extending in an easterly direction toward Berwick, Louisiana — a distance of 9.588 miles — is being relocated and reconstructed in a comparatively straight line.
As reflected by the photograph (Defendant’s Exhibit No. 7) made a part of this dissenting opinion, the portion of the old road being replaced originally followed the narrow, twisting, and winding ridge of high ground close to Bayou Teche and one of the arms of the lower Atchafalaya River (which connects with Bayou Teche further to the west of the property involved in this suit) that is known as the Teche Ridge. The evidence discloses that, in the area involved, this road lies between swamp lands, gulf and seasonal marshes, and the Gulf of Mexico some 30 miles to the south, and, to the north, arms of the lower Atchafalaya River, Six Mile Lake, Flat Lake, Lake Palourde, and inaccessible swamps that extend for many miles in the direction of Baton Rouge, some 60 miles azvay.

*171

See Notes 1 to 11 on pages 173,174.
*173 1. The small, cleared 10-acre tract expropriated lies between points “A” and “B” while the large, wooded, 38-acre tract lies between points “B” and “C.”
2. Canal No. 4 lies between points “B” and “D” and follows the wooded area. Canal No. 5 and the levee on the Bergeron-Whitney side of it lie between points “C” and "D.”
3. Though not clear from the maps in evidence, it appears Canals 2 and 3 lie, in part, between points “D” and “E”.
4. The Lagonda spur track on the 610 acres lies between points "A” and “F”.
5. "G” is the large cleared portion of the Lagonda tract that had not been subdivided into lots but was, in the main, under cultivation at the time of the taking.
6. “H” is the Cameron Iron works.
7. “I” is Morgan City and "J” is Berwick, Louisiana.
8. “K” is the Southern Pacific railroad and “L” one of the arms of the Atchafalaya river that connects with Bayou Teche.
9. “M” is TJ. S. 90 and is marked in several places to reflect the manner in which it turns and twists in following the -high Teche Ridge.
10. “N” is the bridge across Berwick Bay with which the new road connects after crossing the marshes lying between points "C” and “N”.
11. “0” is land across the Atchafalaya River under cultivation.
In this area is included a tract of 610 acres, all of which formerly belonged to the Lagonda Trust and was once part of a sugar plantation owned by one Clarke, a portion of which was converted into the Bayou Vista subdivision by his children after his death. It is somewhat triangular in shape, being bound on the north by old U. S. 90, on the south by the Southern Pacific railroad, and on the east by property belonging to Elie Bergeron and the Whitney National Bank of New Orleans,[1] the western boundary being the slightly curving spur track running from the railroad and across U. S. 90 to the edge of the river.
Mr. Rapier, the trustee of the Lagonda Trust, testified during the trial that this 610 acres, together with over 700 acres across the railroad to the south, consisting of prairie marsh and swampland, was originally owned by the Clarke family, the present members of which are the beneficiaries of the Lagonda Trust. The father 'of these beneficiaries, in developing a portion of the acreage lying between old U. S. 90 and the Southern Pacific railroad into a sugar plantation, found it necessary, because of the low terrain, to improvise a system to drain the property by constructing a canal across the property (Canal No. 4) to connect with other canals, i. e., No. 3 between Canal No. 4 and the old U. S. 90, Canal No. 2 somewhere in the vicinity and apparently on Bergeron land, and Canal No. 6, originally constructed by the railroad along its tracts. (The testimony is to the effect that Canals Nos. 4 and 6 were from 50 to 75 years old, the latter having been built by the railroad and the former by Clarke.) This system continued even after Mr. Clarke’s death. Being anxious to dispose of the property because they found they lacked the desire and necessary knowledge to successfully carry on the business, and *175 efforts to farm it out proved unsatisfactory, and discovering they could sell it in lots, Clarke’s beneficiaries began, in 1948, to develop the property, a segment at a time, into a subdivision known as Bayou Vista, employing Mr. Theodore F. Kramer as the engineer to supervise the clearing of these segments, the laying out of streets, their grading and shelling, the construction of drains and culverts, and provisions for water supply. According to Mr. Rapier, the property as developed was not sold for cash, but on a credit basis, title being passed after all money due was paid; or after a certain portion was paid, mortgages covering the balance due. A real estate agency in Morgan City was employed to sell the lots. (Although the senior partner of this agency died prior to this trial, no one from this firm was called by Lagonda to establish its claim to this excessive compensation for the property expropriated. Further, reference to Lagonda’s plat discloses lots just back of those fronting old U. S. 90 were sold for $500, $600, and $800 on the whole in the beginning, although there was a gradual increase in price over the years.)
From 1948, when this plan was put into operation, the cleared portion of the 610-acre tract, as shown in the photograph, continued to be drained by a small pump that had been used by Mr. Clarke in connection with his plantation operations. When this exploded in 1955, the Clarke children first rented an engine from Elie-Bergeron, whose property abutted a portion of theirs on the eastern boundary and' who was also the tenant cultivating the-portion of the cleared section not subdivided, and, with it, managed to get the old pump to work. Realizing this could not be considered a permanent solution, and' conscious of their responsibility to the-people who had purchased lots in the Buena Vista subdivision with the understanding it ivas well drained, as well as to their tenant farmer, the Clarkes, in 1957, under the supervision of Mr. Kramer, put in a new pumping station that would comply with specifications of the St. Mary Parish Police Jury in order that they might turn it over to that body for use as a drainage district and thus relieve themselves of the cost of' its operation, only two pumps being installed at the time, and these for the specific purpose of draining only the cleared portion of the Lagonda tract, a portion of which had already been subdivided. It was while-this construction was in progress that the Lagonda trustee, learning the highway department, under resolution adopted in May of 1958, would locate the new proposed superhighway along the southern portion-of the 610-acre tract, for the first time conceived the possibility of draining the wooded area lying between Canal No. 4 and the railroad and proceeded to dig Canal No. 5 along the eastern boundary of the property, throwing the dirt from this canal. *177 •along its far side to keep the water from the Bergeron and Whitney property off the wooded section, and to install a third pump.
According to the composite quadrangle map of the area released by the United States Engineers, and as it was interpreted by Lagonda’s engineer, Theodore F. Kramer, this acreage along the high Teche Ridge was “plus 10 mean sea level,” and, away from the ridge, falls to a plus 4, the land to the back of the tract being plus 2 mean sea level. Mr. Kramer stated approximately 80% of all of the land in the Lagonda tract was only 2 feet (plus 2 mean sea level) above sea level.[2]
The portion of the acreage expropriated in this proceeding is a strip, or right-of-way, 300 feet wide and several thousand feet in length, extending from the Lagonda spur track to the property owned by the Whitney Bank. It parallels the Southern Pacific railroad until it reaches a point near the far eastern boundary, when it takes a slightly northern turn. In the majority opinion it is stated this strip consists of 48.468 acres, and it is on this basis the judgment is here being awarded. However, Lagonda, in a supplemental answer, and the trustee on the witness stand, aver there are only 48.17 acres in the strip taken, and its demand is predicated on this basis. On the map attached to the petition, this is referred to as Parcel No. 60. It is marked on defendant’s Exhibit No. 7 and identified as the land lying between points “A” and “C”.
Reference to this photograph will readily disclose the property involved — and it was so considered by all except two of Lagonda’s experts in appraising it, as well as the trial and appellate courts, and the majority here, in fixing its value — consists of two sections, one being cleared land that extends from the spur track to Canal No. 4, which *179 separates it from the wooded area, and is referred to throughout the testimony as the 10-acre, small, or cleared tract. This is shown by the photograph as the land lying between points “A” and “B” and which the majority states contains 9.642 acres, although Lagonda, by supplemental answer, avers it contains 10.12 acres. The other extends from Canal No. 4 to the Whitney Bank property and is referred to as the 38-acre, large, or wooded tract. This is shown on the photograph as the property lying between points “B” and "C” and is asserted in the majority opinion to contain 38.826 acres, while Lagonda’s answer claims only 38.05 acres in this section. The former was under cultivation at the time of the taking, being planted in sugar cane, with, possibly, some corn. The latter was idle wasteland covered with scrub trees of several kinds and filled with %mderbrush and palmettos.
The plaintiff, being unable to secure the desired parcel from Lagonda needed for purposes of this new superhighway through amicable means, instituted this proceeding, depositing in the court’s registry $11,000, estimated to be the fair market value of the property by its experts, in compensation for the taking, and secured an order dated November 17, 1959, giving the State of Louisiana full ownership of the strip needed, with reservation of all of the minerals thereunder in the owner in perpetuity under the provisions of R.S. 9:5806, as amended by Act No. 278 of 1958 and Act No. 528 of 1960.
The defendant, Edward D. Rapier, as the trustee of the Lagonda Trust, first answered on July 5, 1960, claiming the amount deposited in the court’s registry was not adequate compensation, asserting the true market value of the property at the time of the taking was $62,000, and he prayed for judgment accordingly, less the amount deposited, with interest at 5% from the date of the taking. On May 15, 1961, only 2 days prior to the actual trial of the caser he amended this answer by asserting the amount of $62,000 previously claimed as the market value had been based on the appraisal of the large tract by Lagonda’s expert Stanley M. Lemarie, who valued it at $62,782.50, the trustee having failed to include, through oversight, the amount Lemarie appraised as the market value of the small tract, i. e., $25,300, and he prayed for judgment in the full amount of $87,-300, less the $11,000 deposited in the court’s registry. (Accepting the allegations of the amended answer as true, it is obvious that Mr. Lemarie’s appraisal at these figures, should total $88,082.50 for the entire acreage.)
While the defendant offered 5 experts to establish Lagonda’s claim for additional compensation, i. e., (1) Mr. Rapier, the trustee, (2) Mr. Lemarie, (3) Mr. Michel Hebert, (4) Mr. Ned Russo, and (5) Mr. *181 John Edwin Kyle, Jr., the trial judge rested Tiis decision almost entirely upon the testimony of Mr. Lemarie, whom he felt was '“the best qualified and most experienced ■of all the appraisers,” and principally because he felt the highest and best use to which the smaller tract could be put was industrial,[3] the remaining acreage being valuable for residential subdivision purposes, conclusions with which the trial judge agreed. However, finding Mr. Lemarie’s estimate of $88,000[4] exceeded the amount prayed for by $700, he reduced this to $87,300, and, as corroboration, added to this the appraisal of $70,799.61 given by Mr. Hebert,[5] whom he also felt “to be well qualified for appraising this particular property,” and divided the total of $158,199.61 by two, rendering judgment in favor of the Lagonda Trust for $79,099.80, less the $11,000 deposited in the court that had already been turned over to Lagonda, with interest at 5% from November 17, 1959, until paid, and all costs. He rejected in toto the appraisals of Lagonda’s other experts: Mr. Rapier’s because his figures were “higher than the others” and too high in his opinion, although he felt this witness was thoroughly qualified as an expert; Mr. Russo and Mr. Kyle because they appraised the “whole tract as residential subdivision,” and the trial judge felt the best use for the smaller tract was industrial, with which he stated Mr. Lemarie and Mr. Hebert agreed. (In this respect the trial judge was in error. Mr. Hebert, like Russo, Kyle, and Rapier, appraised the property as best adaptable for conversion into residential subdivision lots, but, unlike Russo and Kyle, he treated each section separately and not “in globo.”)
Although admitting the award thus made by the trial judge was an “unprecedented increase” in cases of this kind, the Court of Appeal, affirming this judgment, concluded the best and highest use of the small tract was “light industrial” while that of the large tract was “residential subdivision adaptability.” In reaching this conclusion it also relied on the testimony of both Hebert and Lemarie, although it recognized the former had classified the best use for the entire tract as “residential subdivision development.” The appellate court felt the trial judge correctly disregarded the testimony of Mr. Rapier; refused to consider the appraisal of Mr. Kyle because it *183 was predicated on his estimation of the value of what he would be ivilling to pay for the property, a "totally unacceptable criterion” under the jurisprudence; and that of Mr. Russo as valueless because he “did not fully explain the manner in which he arrived at his appraisal.” See, La.App., 152 So.2d 272. (The emphasis has been supplied.)
The majority, concluding the “highest and best use to which the entire acreage * * * could be put at the time of the expropriation was for a residential subdivision” has thus reversed the conclusions reached by both lower courts, as well as that of Mr. Lemarie, upon whose testimony alone it relies, that the small tract could best be used for industrial purposes. However, in fixing the unwarranted and excessively large award in this case, the majority relies entirely upon Lemarie’s appraisal of the large tract alone, stating this is “the most detailed and well founded one and, therefore, should be adopted,” particularly since the “basis for his figures” is “unrebutted,” and not “out of line with those of Mr. Russo and Mr. Kyle.” Yet the majority has rejected the Kyle appraisal because it was predicated on the acreage as a whole, without consideration being given to the difference between the two tracts, and, further, because of his failure to detail the basis therefor; that of Russo because he “appraised the entire acreage as a whole * * without any detailed basis” for his conclusion it was worth $1,250 an acre as residential property; that of Rapier not only because it was excessive, but because he failed “to take into account certain deductions established by his own witnesses to be proper, and, further, because it is far greater than the value alleged in his answer; and that of Hebert ($94,854.36 when properly computed as reflected by Footnote No. 5) for the same reasons Rapier’s was. rejected. (I might add the evaluations of Kyle and Russo are further valueless because neither of them saw the property at or near the date of the taking, Kyle-vaguely remembering he had been “back there” some time early in 1958, and Russo only having been requested to make his appraisal several weeks prior to the trial in May of 1961.) I wholeheartedly concur in the holding of the majority that the-appraisals made by these experts must for these, as well as other reasons not necessary to discuss now, be rejected as totally unacceptable in assisting this court to ascertain the true market value of the expropriated strip at the time of the taking in November 1959.
It is also my opinion the majority properly rejected Lemarie’s classification of' the small tract as light industrial or commercial for, in this respect, he is contradicted by each and every other witness who> testified. While, as pointed out by the majority, “one or two * * * other witnesses” concluded the small tract "could *185 be so used,” my appreciation of their testimony is that it was possible to use any property anywhere for industrial and commercial purposes provided there is no zoning restriction on such use. The mere fact that at some time in the unforeseeable future this small tract could be used for industrial or commercial purposes does not create a demand or a market for it as such at the time of the taking, and the record clearly establishes that there was no demand for this small tract as such during the 11 years the subdivision had been in existence, from 1948 when it was begun to November 1959 when the expropriation suit was instituted, and that even at that time it was being used for agricultural purposes only. (The emphasis has been supplied.)
However, I cannot accept the majority’s evaluation of the Lemarie appraisal as the one that must be adopted by this court because it was the most detailed, well founded, and the basis for his figures are unrebutted. A mere examination and analysis of this witnesses’ detailed work sheets will disclose they themselves rebut his testimony and his appraisal. They were, in addition, out of line with the testimony of every other witness who testified, and were calculated to favor Lagonda. Indeed, when his testimony and these work sheets are studied and analyzed together, they disclose he made so many errors in his calculations and computations his appraisal, like the appraisals of Lagonda’s other 4 experts that have been rejected by the majority, cannot be accorded any credence in fixing the true market value of even the large tract — semi-swamp, marsh, and wasteland ■ — -for residential subdivision purposes. The majority actually gives a measure of recognition to this when it admits that its computation of his appraisal of the large tract according to his own figures reflects it should have been $53,502.22, although in the amended answer filed by Lagonda it is stated he valued it at $62,782.50.
The record shows the services of Mr. Lemarie were secured by the trustee, Mr. Rapier, for the purpose of going to St. Mary Parish to appraise two parcels being taken from the Lagonda tract for highway purposes, Parcels 59 and 60. He had never, prior thereto, made any appraisals in this section, although unquestionably the long list of qualifications he accumulated over the years since he first entered the real estate field in New Orleans in the 1920s— and as set out in written form on another of defendant’s exhibits — are most impressive.
Mr. Lemarie testified that after discussing the matter with a number of real estate men and appraisers in the area and examining recorded sales in different sections close by, he concluded his best approach to the problem was to use as "com-parables” the sale of the "35 lots” made by Lagonda in the already developed sub *187 division during the year 1959, just prior to the taking in November, and he introduced his work sheets reflecting the manner in which he arrived at the conclusion Lagonda would realize from the sale of the land in the wooded tract between Canal No. 4 and the railroad after its development into a residential subdivision $5,323 an acre. From this he deducted $550 for clearing and grubbing and $1,000 for the construction of streets, figures furnished him by Lagonda, despite the fact he himself felt they “would run a little bit higher” (Tr. 116), with the result that at this point he was left with a balance of $3,773 ($5, 323 less $1,550). Next, using what he termed “rule of thumb” deductions used by all expert appraisers in computing the value of raw land prior to its conversion into a residential subdivision, he deducted $1,064 (20% for the value of the land in the streets in each acre), and also $1,065 (25% of the base figure in order to make allowance for the fact that the land was being sold in bulk and not by lots), this latter including the cost of development from the standpoint of financing, management, advertising, sales commission, attorney fees connected with passing title to the lots, and profit. (He stated this would run from 20% to 30% and used the median as his deduction, although because of the problems presented in the land he was appraising it would seem to me 30% would have been the fairer percentage to cover all of these items, particularly since 35% has been accepted by the courts as a proper base. See, State of Louisiana, Through the Department of Highways v. Riley, 143 So.2d 396.) These two amounts totalling $2,129, he deducted this from $3,773, and secured a balance of $1,644 as the value of the raw land in each acre in the large wooded tract of the expropriated strip. However, for no given reason, he upped this by $6 to $1,650 before he computed the value of the acreage in the wooded tract.
The first error that is so apparent it leaps to the eye is the fact that in computing 20% of $5,323, Mr. Lemarie secured $1,064, while in computing 25% of this same amount he secured the figure of $1,065— only $1 more for an additional 5%. Twenty percent of $5,323 is $1064.60 and 25% of this same amount is $1,330.75, for a total of $2,395.35. This amount, deducted from the balance he had of $3,773 after deducting for clearing, grubbing, and street construction, leaves $1,377.65, not the $1,650 he was using for his base before multiplying by the number of acres in the large tract — a difference of $272.35 an acre alone on this one phase of the computation. Computed on the basis of the 38.05 acres claimed by defendant in its amended answer, this makes a difference of $10,362.92 in the value Lemarie placed on the large wooded tract. This is the only error recognized by the majority to have been made in its reduction of Mr. Lemarie’s computed *189 base figure of $1,650 as the value of the raw land in an acre of ground in this wooded section to $1,378, but the result is incorrect inasmuch as this has been multiplied by the 38.862 acres the majority states is the size of the large tract although Lagonda’s answer seeks judgment for only 38.05 acres in this tract. It is interesting to note, also, that this large error in over-evaluation appears on these most detailed and well founded work sheets of Mr. Lemarie that have been filed in evidence, for although he writes on the second of these sheets he is deducting 25% because the sale of this land is in bulk and not by lots, the figure he carries out amounts to only 20% of the base average acre value after development, stated to be $5,323, and used in his final conclusions and calculations on these work sheets, although he recognized a deduction for salefjn bulk can be as high as 30%. However, this is not the only error Mr. Lemarie made in his appraisal of the value of the acreage in the large wooded tract, although the only one recognized in the majority opinion.
While Mr. Lemarie’s work sheets are neat and appear to have every evidence of a business-like approach to the problem of appraising this large wooded tract, I note he does not list thereon only the “35 lots” he stated on the stand had been sold by Lagonda from January to November 1959 in the developed portion of the subdivision, and used by him to arrive at his conclusion a developed acre in the wooded strip would bring Lagonda $5,323, but, in fact, has listed 39 lots. According to his calculation based on the actual sale price realized by Lagonda from the sale of these lots, these total $44,450, and include a group of 7 lots immediately to the north and across Canal No. 4 from the 212-acre wooded portion of the Lagonda tract, and also abut the Bergeron property, which were sold as a block for $8,200, or $1171.43 a lot, as well as some that were far removed from the wooded area along Canal No. 4 '(and still further from the expropriated strip along the southern boundary adjacent to the railroad) and much closer to the old U. S. 90, are larger in size, on corners, and in favored sections close to the school and/or churches, 1 of which was sold for $1,800, 1 for $1,600, 2 for $1,550 each, and 4 for $1,300, whereas by far the majority of these 39 lots sold for much less. As just pointed out, 7 sold for only $1171.43 each. In addition, 10 sold for $1,200 and 11 sold for $1,250. These were more or less adjacent to or in closer proximity to Canal No. 4 and the wooded area. However, accepting Mr. Lemarie’s conclusion as correct that all of these 39 lots brought Lagonda during 1959 up to the date of the taking $44,450, this reflects an average price per lot of only $1,139.75[6] Mr. Rapier, *191 the trustee, testified actual experience had shown an acre of land after. development would yield only 3 and 1/3 lots (in this he is corroborated by Mr. Hebert), which reflects that on this basis Lagonda was receiving an average of $3,799.17 from the sale of the lots in each acre in the developed portion of the Bayou Vista subdivision, and not the $5,323 Mr. Lemarie testified to on the stand, a difference of $1,523.83 an acre, or an over-evaluation by him on the 38.05 acres in the large tract of almost $58,000 on this alone. This error was obviously overlooked by the majority, as well as by both lower courts.[7]
If any confirmation is needed to show the property as appraised by Mr. Lemarie on the stand with respect to the wooded portion of the expropriated strip was excessive and unwarranted, we need only refer to a plat in the record (defendant’s Exhibit No. 15), which discloses that the 61 lots close to Canal No. 4 along the wooded area in the already developed Bayou Vista subdivision ■ — lying between Jupiter and Polaris roads —were sold by Lagonda about the time of the taking and throughout 1960 and even into 1961, when the trial occurred (the vast majority being in 1960), for prices ranging from $1,000 a lot to $1,400, depending upon size and location, for an average of only $1,232 a lot, with still a couple of lots in this particular location remaining unsold at the time of the trial, as compared to the average of $1,139.75 of the 39 lots used by Mr. Lemarie in his computations.
Furthermore, it is apt to observe here that if Mr. Lemarie had desired to use true comparables from the Bayou Vista subdivision as the basis for his computation of the value of an acre of raw land in this wooded section, he would have used those lots immediately to the north of Canal No. 4 that were nearer the wooded area, or others similarly located, rather than endeavoring to enlarge the value of the property here expropriated by including lots that were by no means comparable in that they were located on the already constructed access roads to old U. S. 90, were large or corner lots, or adjacent to the school and/or churches. This was the approach used by *193 Mr. Hebert in endeavoring to secure com-parables that would more nearly approximate the value of the land in the small 10-acre tract, i. e., he used the lots immediately north of this cleared portion of the expropriated strip that had been sold by Lagonda for prices ranging from $1,250, $1,300, and $1,400, averaging approximately $1,317. Further, because the small cleared portion of the strip was even farther to the back, he reduced the lots there by some $167 to $1,150 a lot before he began to make his computations in appraising the value of this small tract, and still another $250 a lot for the portion of Parcel 60 lying in the wooded area, or $833.33 an acre, because of this and other factors, such as being still further to the back, with the result it would take a least 2 to 3 years for the development to reach there, which made this too speculative and conjectural.
Mr. Lemarie not only failed to make any such allowance, although the property from which his “comparable” sales were taken were not only separated from the wooded portion of the strip by a wooded area in excess of 200 acres, but also by Canal No. 4, over which there were no bridges, and were thus still further removed from the access roads leading to old U. S. 90, and it would have been more difficult to reach them inasmuch as no plans whatever had been drawn for the laying out of the roads in this wooded area, or for the location of such bridges that would have to be built over Canal No. 4 before purchasers of the lots in this large wooded area would have been able to cross Canal No. 4 in an effort to reach the access roads to Old U. S. 90 leading to the new superhighway with its controlled access approaches. These selections made by Mr. Hebert were much more comparable to the property involved in this expropriation proceeding, for they were further to the back. Mr. Lemarie, therefore, should have made at least some reduction in the value of his acreage to account for the depreciation in these lots because of their location at the extreme back or southern portion of the Lagonda tract, as well as because it was admitted by both Mr. Rapier and Mr. Kramer the acreage in the wooded section was lower than that in the cleared small portion of the strip. Mr. Hebert, whose testimony was given much respect and credence by both lower courts, and, in a measure, by the majority in evaluating the tract lying between Canal No. 4 and the railroad, took into consideration the fact the property in even the small tract was far to the back, as just demonstrated, by making a reduction of some $167 a lot. Neither the majority, nor Mr. Lemarie, take this into consideration.
Mr. Lemarie took the position that the lots in the wooded portion of the expropriated strip, even those up against the railroad, were just as valuable as any others in the Lagonda tract, even those on the high ridge and abutting old U. S. 90. In this *195 respect his testimony is not only impeached by every witness who testified on the subj ect, but we think even common sense would be sufficient to refute this conclusion.
Mr. Rapier, Lagonda’s trustee, testifying with respect to the proximity of the area next to the railroad, said: “I believe the area against the railroad zvould have less value than anything else" and to allow for this he adjusted his evaluation of the property in the cleared tract by deducting $300 an acre. He said he found "an undesirable frontage," such as this, is properly treated by turning the side of the lot to it rather than the front, with the streets going at right angles to the railroad, and by reducing the lots to 140 or 150 in length it was possible to get four lots to a square, with the result each of the two lots up against the railroad would have to be reduced at least $50 each to make them attractive to purchasers.[8] This makes a total deduction of $400 an acre allowed even by Mr. Rapier, Lagonda’s trustee, but ignored by Mr. Lemarie, and not considered by the majority. (The emphasis has been supplied.)
Another matter about which Mr. Lemarie was totally impeached is that the construction of the new superhighway along the southern boundary of Lagonda’s tract would have no influence on the value of the property taken for residential purposes. In this he is contradicted by every witness who testified on the subject, including Mr. Rapier, who stated that upon learning of the new highway and its location, he began to make plans to drain the wooded area and to think about its eventual development as a residential subdivision. He also said that he took all of the unsold land in the entire 610-acre tract off the market to wait for the enhancement in value expected to result from the new highway, so that Lagonda could reap the benefit from a “ride” on this, and which he stated it had, to the extent of several thousand dollars an acre for the portion remaining unsold in both the cleared and wooded sections.
There are several other errors connected with Mr.' Lemarie’s computations, all of which favored Lagonda, that I feel I should mention since the money of the taxpayers is being used to pay the award for the property here expropriated, and nothing more than the actual and true market value of the property as a whole should be considered in fixing the amount thereof. I do this although these may be considered as *197 minor or petty. For example, Lemarie’s work sheets reflect that his computation of the average value of the land in the wooded portion of the strip after development as a subdivision would bring Lagonda $5,314 an acre, yet, in carrying this forward, and also in testifying, he upped this by $9 an acre to $5,323, without any explanation or reason, just as he upped the $1,644 average value of the raw land in each acre after deductions by $6 to $1,650. In accepting his figure of $5,323 as correct, the majority deprives the state of the benefit of at least $9 an acre deduction for the acreage in the wooded area, and also in the cleared tract, since it, too, is predicated on this base figure of $5,323. Also, as pointed out above, the majority computation is not based on the 48.17 acres claimed by Lagonda in its supplemental answer, but on the basis of 48.468 acres.
I feel the facts as disclosed by this record, when properly applied to the law, will clearly demonstrate the defendant has totally failed to establish the true market value of the property taken in this case is greater than the appraisal placed thereon by the state’s experts. In fact, it is my opinion that when this evidence is properly analyzed and evaluated, it supports the state’s expert appraisers.
The amount to be awarded when property is taken for public use is the market value of the property in the condition in which it exists at the time of the taking. Further, market value, as I understand it, is a price-agreed upon by a willing and informed buyer and a willing and informed seller under ordinary circumstances, and the landowner bears the burden of proving his claim to a legal certainty and by preponderance of. the evidence. The majority recognizes this to be the law. See, Parish of Iberia v. Cook, 238 La. 697, 116 So.2d 491; State of Louisiana, Through Department of Highways v. Chadick, 226 La. 367, 76 So.2d 398; Caddo Parish School Board v. Willer, 227 La. 201, 78 So.2d 833; Koerber v. City of New Orleans, 234 La. 433, 100 So.2d 461; Housing Authority of New Orleans v. Boudwine, 224 La. 988, 71 So.2d 541; Southern Amusement Co. v. United States, 5 Cir., 265 F.2d 34; State of Louisiana, Through the Department of Highways v. Riley, La.App., 143 So.2d 396; Opelousas G. & N. E. R. Co. v. Bradford, 118 La. 506, 43 So. 79; Nichols, The Law of Eminent Domain (3rd Ed. ' 1952) Vol. 5, Section 18.11(2) pp. 157-162; 29 C.J.S. Eminent Domain, § 160, pp. 1024— 1029; 18 Am.Jur. 879-881, Section 244; State of Louisiana, Through the Department of Highways v. Levy, 242 La. 259, 136 So.2d 35, and the authorities therein cited.
This court in Parish of Iberia v. Cook, supra, said: “ * * * possible uses which are so remote and speculative and which would require the concurrence of so many extrinsic conditions and happenings as to *199 have no perceptible effect upon present market value should be excluded from consideration. * * * The owner’s plans or hopes for the future should be held completely irrelevant, being more often illusory than real.” (The emphasis has1 been supplied.)
I think the majority, and also the two lower courts, in applying this law were not only misled by the purportedly well founded and business-like computations of Mr. Lemarie, which, as just shown, will not stand up under scrutiny, but also by the belief or assumption the entire 610 acres in the Lagonda tract were a developed subdivision as of the date of the taking. As Mr. Lemarie himself states in his testimony, Lagonda told him they had an “overall plan” for developing the tract and although he “saw no maps of any subdivision of that particular area,” the "wooded area was more or less all developed and that a great number of lots had been sold.” (Tr. 105, 108.) He stated, further, that he understood "all lots in the developed portion of Bayou Vista had been sold out and people still wanted lots.” (Tr. 108.) As just demonstrated by the large number of lots in the subdivided portion of Bayou Vista sold during 1960 and 1961, and even some remaining unsold at the time of the trial, this latter is not true. (The emphasis has been supplied.)
One has only to look at the photograph hereinabove reproduced to see that the area between Canal No. 4 and the railroad could not, under any consideration, be considered a fully, or even partially, developed subdivision at the time of the taking, “more or less all developed” as Mr. Lemarie puts it. It is admitted by all of the witnesses, including Lagonda’s trustee, that no plans whatsoever had yet been drawn for the subdividing of this wooded area. In fact, it is obvious that it had not even been cleared of trees, which was necessary before it could be levelled for the laying of streets preparatory to the subdividing of the lots.
In the Cook case it was very aptly observed that although situations may arise where land is actually available for subdivided lots, in such cases "[t]he measure of compensation * * * should not be the aggregate of the prices of the lots into zvhich the tract could be divided, for so many contingencies may intervene as to make such measzire of compensation too uncertain and conjectural. The test is the market value of value of the land as a whole, taking into consideration its value for building purposes of a not too speculative nature.” Or, as put in the Bradford case, supra "what the owner or ptirchaser might realise by a subsequent subdivision of the property and sale of lots partakes too much of the character of speculation to serve as a basis of valuation” as of the date of the taking. (The emphasis has been supplied.)
This test and law, applied to the case under consideration, will leave the defendant without any evidence whatsoever to sup *201 port Lagonda’s claim, as all of the testimony of Mr. Lemarie is based on the aggregate price of the lots into which the expropriated tract could be divided, and not on the market value of the land as a whole, which, as of the date of the taking was, in the small tract, being used for agricultural purposes, and, in the large, was wasteland. However, it is my opinion that the testimony of Mr. Lemarie and Mr. Hebert, as well as that otherwise corroborated, fully supports the appraisal put on the property by the state’s experts as of the date of the taking in November 1959.
For example, using the deductions as Mr. Lemarie did in his appraisal, and which he said were employed by all appraisal experts as “rule of thumb” in valuing raw land prior to its conversion into a residential subdivision, and accepting Mr. Hebert’s figures as correct (which are higher than Mr. Lemarie’s when properly computed), i. e., that the ultimate return expected from the acreage in the cleared strip is $3,795, they will support the conclusion of the state’s experts that the land in the small tract was not worth more than $1,000 an acre, while that in the wooded section could not be developed on an economically sound basis at the time of the taking.
In appraising the small tract, Mr. Hebert failed to make proper adjustment because of the property’s proximity to the railroad, as he did in fixing the value of the large tract, and which, according to Mr. Rapier, would be- $400 an acre, thus' leaving Mr. Hebert with a figure of $3,395 an acre as the amount Lagonda would have realized from the land in this tract after its development as a residential subdivision. He also failed to deduct $679 (20% for the value of the land used for streets), and $848.75 (25%) for sale in bulk instead of by lots. These items, when added to the $787 he did allow for street construction and water supply under the figures furnished him by Lagonda for the small tract, total $2,314.75, and when this is deducted from $3,395, it leaves a value of only $1,080.25 an acre for the land in the small tract. Even this does not take into consideration the fact that some expense would be involved in removing the cane stubble from this land and levelling it preparatory to laying the streets, which would bring the amount close to the $1,000 an acre estimated by Mr. Blouin, if not below it. It also does not take into consideration Mr. Lemarie’s statement that as high as 30% is recognized as a legitimate percentage of deduction where the sale is in bulk.
Again, accepting as correct the figure of $2,970 an acre for the land in the large tract before deduction, we find that Mr. Hebert allowed only $1,337 as his deduction for development costs in this section, — $787 for construction of streets and water supply and $550 for clearing and grubbing. He overlooked completely the testimony of *203 other Lagonda witnesses that the cost of constructing streets and furnishing water supply in the large tract would be much greater than in the cleared portion of the strip, and which was fixed by Mr. Kramer, the engineer, and accepted by Mr. Lemarie (although he felt it would go higher), at $1,-000 an acre. He also overlooked the 20% deduction for the land used in the construction of the streets — $594. And, finally, he overlooked the necessary adjustment that must be made when raw land is sold in bulk instead of by lots after development, estimated by Lemarie to be between 20% and 30%, although he used 25% as the medium between these in making his computations, and which, at this figure, would require a still further deduction by Mr. Hebert of $742.50. When all of the deductible items are added we have a total deduction of $2,-886.50. This deducted from Mr. Hebert’s estimate that the land in the large tract was worth $2,970 to Lagonda after development as a subdivision, leaves us with a value of only $83.50 an acre for the raw land in this section before development. However, I think a deduction of at least 30% for the sale in bulk instead of by lots would be more appropriate under the facts of this case, not only because of the condition of the land in the low terrain in this wooded section, but also because of the length of time it would take to develop it and sell it- as lots in a residential subdivision. Mr. Hebert himself testified it would take from 2 to 3 years for development to reach Parcel No. 60 here being taken by the highway department. See, State of Louisiana, Through the Department of Highways v. Riley, La.App., 143 So.2d 396, where even 35% has been recognized as allowable for such a deduction. Even at this, Mr. Hebert, like all of the Lagonda experts, failed to consider the cost of filling the water holes that Mr. Rapier and Mr. Kramer, under pressure of cross-examination, finally admitted were there as of the date of the taking. Either based on the 25% deduction for sale in bulk, or 30%, however, I think this clearly corroborates the testimony of the state’s experts to the effect that the land in the wooded area could not be developed as a residential subdivision on an economically sound basis.
A mere reference to the case of Domino v. Domino, 233 La. 1014, 99 So.2d 328, in which this court placed a value of $1,234 an acre on the land therein involved, and which is apparently cited by the majority in an effort to show the $1,378 an acre it is placing on the acreage in the wooded portion of the strip under the Lemarie appraisal (which land is plus 2 mean sea level, in a swampy and marshy condition, filled with trees, far removed from old U. S. 90 or any access road thereto, and adjacent to the railroad), is justified, will reveal it is no way comparable. The land in the Domino case, which was decided in 1957, 2 years prior to the taking in the Lagonda case, was *205 much closer to Morgan City than the property here involved. It was choice, high land along the Teche Ridge that had not only been fully developed, but was under lease to commercial, industrial, and business concerns for sums that warranted or supported a capital investment in the amount of $1,234 an acre as fixed by this court. Finally, that land abutted U. S. 90, a railroad, and the Intercoastal Canal, and it was because of the scarcity of such high land with access to all of these arteries of travel in this vicinity that the court felt warranted in holding it was worth $1,234 an acre, which is lower than the $1,378 being fixed in the majority opinion for the wasteland in the wooded section of the expropriated strip that is miles from any road, at the extreme rear of the Lagonda tract, and certainly not close to any waterway or highway used for travel as of the date of the taking.
Finally, one of the reasons assigned by the Lagonda experts for the excessive amount of their appraisals of the property expropriated, and which is relied on by all courts in fixing the amount to he awarded, is the industrial boom and resulting large demand for land in the area of Morgan City. However, the record unmistakably shows that in the 11 years during which the Bayou Vista subdivision was being developed, a small portion at a time, only 735 lots had been sold and, on these, only 240 homes had been built, according to Mr. Rapier, the trustee. And even at the time of the trial of the case, a year and a half after the expropriation, there were still large portions of the cleared part of the subdivision between old U. S. 90 and Canal No. 4 that had not even been subdivided into lots, but continued to be used for agricultural purposes, and even some of the subdivided lots had not been sold. Had this great demand existed, all of the cleared portion of the Lagonda tract, and the wooded section, would have been fully developed, sold, and built on at the time the property in this suit was taken by the state for highway purposes.
For these reasons, I must respectfully dissent from the award fixed in the judgment in the majority opinion, which is not only an unprecedented increase in awards of this kind, as pointed out by the Court of Appeal in affirming the judgment of the district court, but not supported by any credible evidence whatsoever.

. The Bergeron property abuts old TJ. S. 90 and runs back toward the railroad until it joins the Whitney Bank land. The latter tract and the southern portion of the Bergeron land are admittedly ' marsh and swampland.

. In the majority reference is made to the fact that a subdivision lai-gely under water just outside Berwick had been successfully developed for residential purposes on a profitable basis. However, one of Lagonda’s experts, Mr. Kyle, the developer, testified in this case that because of this condition it was necessary for them to got $3,500 a lot (Tr. p. 82) to make this a profitable venture. Further, the testimony with respect to the Palourde subdivision, only 1 mile east of Morgan City and abutting U.S. 90, with a terrain of jilus 1.5 mean sea level (just under the plus 2 mean sea level for most of the Lagonda land), discloses the original developer, purchasing the property at $1,000 an acre from Mr. Rapier, Lagonda’s trustee, “lost liis shirt” in his effort to convert it into a residential subdivision, and the one who took over from him, to make it usable for such purpose, could only do so by pumping mud in from Lake Palourde and building the property up to a depth of plus 5 mean sea level. Mr. Kyle himself turned down the Palourde acreage offered him at $1,000 an acre because he stated it was too expensive to develop. (Tr. 95) Lagonda’s attorney, during questioning, stated the evidence showed cost of developing Palourde, including the $1,000 an acre as raw land, would run as high as $5,000 an acre. (Tr. 179.)

. Lemarie testified he felt the best and highest use for the small tract was “light industrial or commercial.”

. According to the appraisals of Mr. Lemarie as set out in the amended answer, this should have been $88,082.50.

. The correct computation of Mr. Hebert’s appraisal according to his base figures and the acreage used (10.12 for the small tract and 38.5 for the large, as prayed in the answer) was $30,828.86 for the small tract and $64,025.50 for the large, or a total of $94,854.36, and not the $70,799.61 testified to on the stand, a difference of $24,054.75.

. These sales are reflected on a plat maintained by Lagonda for the purpose of showing sales in the Bayou Yista subdivision, the prices received, and the *191 datos of the sales. See, defendant's Exhibit No. 7 in the record in the companion case involving Parcel S9, also taken from the Lagonda tract, which was made a part of the record here. It is apparent a similar map was included with the exhibits in this case, but has become misplaced in some manner.

. In justice to the venerable trial judge and the appellate court, as well as the majority here, this was not discussed nor in any manner brought out by the attorneys or engineers representing the highway department, but result from my individual study of this entire record, and in particular Mr. Lemarie’s testimony and computations since all parties apparently relied upon it more than anything else in awarding this excessive judgment, and the majority award is based entirely on his appraisal of the acreage in the large tract, for ho did not appraise the small tract for residential purposes.

. Mr. Rapier testified that to comply -with parish specifications for subdivisions, a road at least 50 feet wide would have to be constructed along the railroad boundary to permit fire fighting equipment to get in there, and, further, that the houses would have to be set back a certain distance from the railroad right-of-way. Lagonda would not only have lost this land when subdividing, which has not been valued and deducted in any computation, but with this expropriation it is relieved of the expense of constructing such a road.